IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

ROBERT B. STEWART,                      )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )   Case No.
                                        )   08-4165-CV-C-REL-SSA
MICHAEL J. ASTRUE, Commissioner         )
of Social Security,                     )
                                        )
            Defendant.                  )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Robert Stewart seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
application for disability benefits under the Social Security Act
("the Act").  Plaintiff argues that the ALJ erred in finding that
plaintiff's cardiomyopathy is not a severe impairment.  I find
that the substantial evidence in the record as a whole supports a
finding that plaintiff experienced significant medical
improvement and is no longer disabled because he does not suffer
from a severe impairment.  Therefore, plaintiff's motion for
summary judgment will be denied and the decision of the
Commissioner will be affirmed.

*I.    BACKGROUND*

On February 20, 2001, plaintiff applied for disability
benefits and his application was granted.  On May 24, 2006,
plaintiff was notified by the Commissioner that his case had been
reviewed and it was determined that his disability had ceased on

May 15, 2006.  Plaintiff filed a request for reconsideration which was denied on September 25, 2006.  On July 17, 2007, a hearing was held before Administrative Law Judge F. Terrell Eckert.  On August 28, 2007, the ALJ found that plaintiff was not under a disability as defined in the Act.  On June 9, 2008, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into

2

consideration the weight of the evidence in the record and apply
a balancing test to evidence which is contradictory." Wilcutts
v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v.
Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It
means such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." Richardson v. Perales, 402
U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th
Cir. 1991). However, the substantial evidence standard
presupposes a zone of choice within which the decision makers can
go either way, without interference by the courts. "[A]n
administrative decision is not subject to reversal merely because
substantial evidence would have supported an opposite decision."
Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

The Social Security Administration has promulgated detailed
regulations setting out a sequential evaluation process to
determine whether a claimant has experienced medical improvement
and is no longer disabled. The ten-step sequential evaluation
process used by the Commissioner is summarized as follows:

1.   Is the claimant performing substantial gainful
activity?

> Yes = not disabled.
> No = go to next step.

3

2.  Does the claimant's impairment meet or equal a current listed impairment?

> Yes = disabled.
> No = go to next step.

3.  Has there been medical improvement of claimant's impairments since the comparison point decision?

> Yes = go to next step.
> No = go to step five.

4.  If there is medical improvement, is it related to the ability to do work?

> No = go to step five.
> Yes = go to step six.

5.  If there has been no medical improvement or medical improvement has occurred which is not related to the ability to do work, do any of the exceptions to the medical improvement standard apply?

> No = disabled.
> Yes = go to next step.

6.  Does the claimant have a severe impairment?

> No = not disabled.
> Yes = go to next step.

7.  What is the claimant's RFC based on all current impairments?  Does the claimant's impairment prevent him from doing past relevant work?

> No = not disabled.
> Yes = go to next step.

8.  Does the claimant have a marginal education and work experience that is limited to arduous, unskilled physical labor?

> Yes = disabled.
> No = go to next step.

4

9.   Is the claimant of advanced age with a limited education and no work experience or no recent and relevant work experience?

                    Yes = disabled.
                    No = go to next step.

10.  Does the claimant's impairment prevent him from doing any other work?

                    Yes = disabled.
                    No = not disabled.


## IV.  *THE RECORD*

The record consists of the testimony of plaintiff and documentary evidence admitted at the hearing.

### A.  *SUMMARY OF MEDICAL AND ADMINISTRATIVE RECORDS*

On December 26, 2000, plaintiff was admitted to University of Missouri Hospital in Columbia (Tr. at 89).  He was discharged on January 3, 2001, with a diagnosis of congestive heart failure, alcoholic cardiomyopathy,[1] chronic alcoholism, chronic obstructive pulmonary disease, and hypertension.

On January 16, 2002, Administrative Law Judge Craig Ellis found plaintiff disabled and awarded benefits (Tr. at 33-38). Judge Ellis's order reads in part as follows:

------------

[1]Drinking alcohol in large quantities has a toxic effect on the heart.  Alcoholic cardiomyopathy is a condition in which the heart becomes enlarged and the heart muscle thins due to alcohol abuse.  Alcoholic cardiomyopathy causes the weakened heart muscle to pump inefficiently, leading to heart failure.

Case 2:08-cv-04165-REL   Document 16   Filed 05/29/09   Page 5 of 26

A chest x-ray performed on December 30, 2000, revealed that the claimant had an enlarged heart. On January 2, 2001, the claimant underwent a right and left heart catheterization, coronary artery angiogram, left ventricle angiogram injection, endomyocardial biopsy, and a limited echocardiogram. The results indicated normal coronary arteries, but severe left ventricle systolic dysfunction.

In a report dated February 2, 2001, Mary L. Dohrmann, M.D., a cardiologist, . . . said that he seemed to have congestive heart failure probably secondary to alcohol abuse. The claimant's echocardiogram revealed an ejection fraction[2] of 25-30%. . . .

The claimant received emergency treatment on March 8, 2001, after being found by police lying in the street in an inebriated state. In an examination, the claimant's heart was found with a regular rate and rhythm. However, the claimant signed out against medical advice after he was told he would have to stay in the hospital for detoxification. At discharge, he was described as "inebriated, but . . . able to walk out under his own power".

In a letter dated June 14, 2001,[3] Dr. Dohrmann discussed the claimant's current condition vis-a-vis the results of stress testing that was performed at this visit. She said that the claimant's diagnosis was idiopathic cardiomyopathy with

---

[2]Ejection fraction is a measurement of the capacity at which the heart is pumping. During each heartbeat cycle, the heart contracts and relaxes. When the heart contracts, it ejects blood from the two pumping chambers (ventricles). When the heart relaxes, the ventricles refill with blood. No matter how forceful the contraction, it does not empty all of the blood out of a ventricle. The term "ejection fraction" refers to the percentage of blood that is pumped out of a filled ventricle with each heartbeat. Because the left ventricle is the heart's main pumping chamber, ejection fraction is usually measured only in the left ventricle (LV). A normal LV ejection fraction is 55 to 70 percent.

[3]The letter states in part as follows: "Mr. Stewart has idiopathic cardiomyopathy with severe left ventricular dysfunction (left ventricular ejection fraction 15%) and compensated congestive heart failure on medical management." (Tr. at 105).

severe left ventricular dysfunction and compensated congestive heart failure on medical management. Regarding the results of stress testing, Dr. Dohrmann said that the claimant exercised for 6 minutes on a standard Bruce protocol. She noted that the claimant completed only Stage II of testing and attained a heart rate of 114. Dr. Dohrmann reported that the testing was terminated when the claimant's systolic blood pressure dropped 10 mm. and he exhibited shortness-of-breath. Dr. Dohrmann remarked that the claimant's calculated degree of functional aerobic impairment was +45% [and] represented a "severe impairment". She said that "Post exercise a new murmur of mitral insufficiency could be ausculted." Dr. Dohrmann commented that "The impaired exercise tolerance, the drop in systolic blood pressure with exercise, and the development of new mitral insufficiency murmur during exercise are consistent with known severe left ventricular dysfunction." She opined that the claimant "is considered disabled by this assessment." . . .

. . . While evidence shows that the claimant continues his excessive alcohol use, the undersigned finds that, even if he discontinued this use, the claimant would be incapable of even sedentary work due to symptoms associated with his heart impairment alone. . . . Sedentary work is the lightest form of work defined by the Commissioner. It involves primarily sitting, only occasional standing and walking, and no lifting in excess of ten pounds. The evidence shows that the claimant could perform the lifting required to successfully engage in sedentary work, but would have difficulty [with] other functional requirements. . . . The evidence demonstrates that the claimant could not sustain a typical 8-hour workday as described above due to fatigue and shortness-of-breath caused by even minimal exertion. . . .

. . . [T]he undersigned finds that the occupational base for sedentary work is so compromised that the claimant cannot perform a significant number of other jobs in the national economy. . . .

The claimant's past history of drug and alcohol abuse is not a contributing factor material to the finding of disability.

On November 2, 2005, the Social Security Administration sent a letter to plaintiff telling him that his case was being reviewed to determine whether he was still disabled (Tr. at 143).

On May 16, 2006, plaintiff saw Arthur Greenberg, M.D., at the request of Disability Determinations (Tr. at 269-272). Dr. Greenberg's report reads in part as follows:

> . . . Claimant is unable to provide any meaningful clinical history and is unaware of his diagnoses or recent treatments provided. Claimant appears intoxicated during exam today and on questioning admits to using alcohol in excess last night.
>
> SOCIAL HISTORY: Claimant reports alcohol use. Drinking is described as social. Claimant denies illegal drug use. Claimant denies tobacco use.
>
> REVIEW OF SYMPTOMS: [Plaintiff denied any symptoms at all].
>
> GENERAL: . . . Intellectual functioning seems impaired throughout examination but but [sic] appears to be compromised by his reported recent alcohol consumption. Recent and remote memory for medical events is poor. Claimant appears to be intoxicated and is unable to follow instructions well during examination.
>
> CARDIOVASCULAR: Heart rate is regular. Normal S1 and S2[4]

---

[4]The first heart sound, S1, is in time with the pulse in the carotid artery in the neck. The second heart sound marks the beginning of diastole, the heart's relaxation phase, when the ventricles fill with blood. During diastole there are two sounds of ventricular filling: The first is from the atrial walls and the second is from the contraction of the atriums. The third heart sound is caused by vibration of the ventricular walls, resulting from the first rapid filling so it is heard just after S2. The third heart sound is low in frequency and intensity. Although an S3 is commonly heard in children and young adults, in older adults and elderly with heart disease, an S3 often means heart failure. The fourth heart sound occurs during the second phase of ventricular filling, when the atriums contract just

without murmurs, gallop, rubs, or clicks. . . .

IMPRESSION:
Alcoholism . . . , Hypertension.

On May 23, 2006, Janie Vale, M.D., completed a Physical Residual Functional Capacity Assessment (Tr. at 191-198). Dr. Vale found that plaintiff had no exertional limitations. In support, she wrote:

> He reports no medical tx [treatment] in the past 12 mos. CE [consultative examiner] Dr. Greenburg 5-16-06 RBS [Robert B. Stewart] presented intoxicated and admitted to Etoh use in excess the nite [sic] before exam, denied angina. BP elevated 151/112, nl [normal] gait, unable to follow instructions well secondary to Etoh. . . . CE exam, self reported ADLs [activities of daily living] most significantly report of no angina and the ability to walk 1 mile, and no hx [history] of medical tx fully supports significant improvement in medical status since ALJ allowance. In 6-01 RBS was only able to perform 6 min EST before being limited by SOB [shortness of breath], drop in BP [blood pressure], and mitral insuf murmur. Cardiopul exam at CE was unremarkable and RBS is physically active and asx [asymptomatic]. The ongoing excess use of Etoh must be considered material to his elevated BP noted at CE. It is consistent with best medical practices that his BP elevations would be improved with decreased use or abstinence from Etoh. He was advised to DC [discontinue] Etoh in the past by TPs [treating physicians]. MER [medical records] supports no severe MDI [medically diagnosable impairments] conditions and significant improvement in medical status as relates to the ability to work.

Dr. Vale found no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations,

---

before S1. As with S3, the fourth heart sound is thought to be caused by the vibration of valves, supporting structures, and the ventricular walls. An abnormal S4 is heard in people with conditions that increase resistance to ventricular filling, such as a weak left ventricle.

Case 2:08-cv-04165-REL   Document 16   Filed 05/29/09   Page 9 of 26

and no environmental limitations. She concluded with, "RBS reports able to do self care tasks, prepare meals, does cleaning and ironing, lists hobbies of fishing, bowling, pool, attend church, able to walk 1 mile."

In a letter dated May 26, 2006, plaintiff was notified that his disability benefits had been terminated.

On July 7, 2006, plaintiff went to the emergency room (Tr. at 241-254). Plaintiff had begun experiencing chest pain the night before. It lasted for about 30 minutes but the pain kept coming back throughout the night. He walked to the hospital and by the time he arrived his pain was gone. "Right now feels fine." His blood work was normal, his cardiac exam was normal, and a stress echo showed a normal ejection fraction. "Estimated left ventricular function appears to be 60% - 65%." His chest x-rays were normal. He was listed as non-compliant with his medications because he had not taken them in the past few days and he continued to drink heavily. "He lives in a shelter facility and continues to drink half a pack of bourbon everyday, stopped smoking a few years ago and denies any use of any recreational drugs. He has a history of marijuana and cocaine use in the past but denies using them recently." He was told to follow up with his primary care doctor within the next three to four days. Dr. William Fay concluded that plaintiff's chest pain

10

was atypical and his cardiac exam was unremarkable. "I think his chest pain is atypical and mostly secondary to medication withdrawal. . . . We have counseled him strongly about alcohol cessation."

On July 17, 2006, plaintiff was evaluated at Phoenix Programs (Tr. at 228-239). Plaintiff reported his last use of alcohol was on July 10, 2006, and that he had used it 23 days out of the past 30. He reported his last use of marijuana was on July 3, 2006, and that he had used it 27 days out of the last 30. He began using both substances at the age of 16. He reported daily use of alcohol and use of marijuana three to six times per week.

When asked how many days in the past month he had experienced medical problems, he reported "one". When asked how troubled or bothered he had been by medical problems during the last month, he said, "not at all." When asked how important employment counseling was, he responded, "not at all."

He reported having spent $96 on alcohol during the past month and $20 on marijuana during the past month. It was "considerably" important to him to get alcohol abuse treatment, but only "moderately" important to him to get drug treatment.

On July 18, 2006, Kendal Thomas, a case manager at Phoenix Programs, Inc., wrote a letter to whom it may concern (Tr. at

11

135). The letter reads as follows:

> This letter is to inform you that Mr. Robert Stewart has
> participated in the residential substance abuse program at
> Phoenix house. While in the program he attended the required
> groups and meetings. His admission date was 7/13/06 and his
> scheduled outdate [is] 8/2/06.

That same day plaintiff completed a Disability Report -
Appeal (Tr. at 149-155). In that form, plaintiff was asked if
there had been any change in his condition since he last
completed a disability report. Plaintiff checked "yes" and wrote
that he stopped drinking and he feels better in his chest (Tr. at
149). The date this change occurred is listed as July 13, 2006,
i.e., five days earlier. He was asked if he had any new physical
or mental limitations as a result of his condition since he last
completed a disability report, and he checked "no" (Tr. at 149).
He was asked to list each doctor or therapist he had seen since
he last completed a disability report, and he listed only Phoenix
House with a first and last visit of July 13, 2006, or five days
earlier. Under hospitals visited, he listed University of
Missouri Hospital, again on July 13, 2006. Finally, when asked
what changes had occurred in his daily activities since he last
completed a disability report, he wrote, "I don't drink any
more." (Tr. at 153).

In an undated Function Report, plaintiff reported that he
prepares his own meals daily; he cleans and irons; he goes

Case 2:08-cv-04165-REL   Document 16   Filed 05/29/09   Page 12 of 26

outside daily and walks; he fishes, bowls, and plays pool; he has
had no changes in his ability to perform these activities since
his condition first appeared; he attends church; and he can walk
a mile before needing to rest (Tr. at 156-162). Plaintiff was
asked to circle all of the items his condition affects, and he
circled only bending and standing out of a total of 19 items.

Plaintiff was asked if he feels he is able to return to
work, and he checked "no" (Tr. at 163). He was asked to explain
how his condition prevents him from working; however, he left
that section blank.

On August 14, 2006, plaintiff saw Dr. Quint for a follow up
on alcoholic cardiomyopathy (Tr. at 225). "He was last seen in
December 2005. Since I last saw him, he has gone through a rehab
program at Phoenix House for 21 days during the month of July.
He is currently staying at Harbor House. His counselors told him
that he needed to see his doctor. He says that he feels well and
really does not have any complaints. No chest pain. No
shortness of breath. No leg swelling. He does complain of
several years now of inability to have an erection adequate for
intercourse and wanted to know if he could try some Viagra."
Plaintiff's cardiac exam was normal. Dr. Quint assessed
alcoholic cardiomyopathy (stable), alcoholism (in early
remission), and erectile dysfunction. He refilled all of

13

plaintiff's medications, ordered blood work, and gave him a sample of Cialis [treats erectile dysfunction].

On September 13, 2006, Mark Altomari, Ph.D., completed a Psychiatric Review Technique (Tr. at 174-187). He found that plaintiff's mental impairment -- substance addiction disorders -- was not severe. He found that plaintiff had no restriction of activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.

On September 24, 2006, plaintiff saw Beth Brandon, a nurse in Dr. Quint's office (Tr. at 224). Plaintiff stated that he was out of all of his medications. "He does have an appointment October 14th, but he is out of his medications. He denies any problems with chest pain or shortness of breath. He says he does not have any leg swelling. He states that he is trying to control his drinking. He says that, in all honesty, he is not abstaining, but he is not letting it get out of control." His cardiac exam was normal. He was given prescriptions for Imdur [prevents chest pain], Lasix [diuretic], Lanoxin [makes the heart beat stronger], Aldactone [diuretic], potassium [mineral], and Lisinopril [for hypertension], and he was given samples of Coreg [for hypertension]. "He is to contact the Health Department for financial assistance with his medications."

14

On October 16, 2006, plaintiff saw Dr. Quint for a follow up on alcoholic cardiomyopathy (Tr. at 223). "He actually feels pretty well. No complaints. Also erectile dysfunction. . . . He finished his program at Phoenix House; he did a rehab there. His last drink was in early August 2006, and he is now homeless. He is staying at New Life Evangelistic Center, and he is hoping to get back his benefits -- his Medicare and SSI check -- so he can get his own housing." Dr. Quint assessed alcoholic cardiomyopathy (stable), alcoholism (in remission), and erectile dysfunction.

On January 22, 2007, plaintiff returned to see Dr. Quint for a follow up on alcoholic cardiomyopathy and hypogonadism.[5] "His main complaint is ongoing erectile dysfunction. He continues to drink alcohol. He had gone through rehab, and had not had anything to drink as of August of 2006, but now he tells me he is drinking anywhere from a half to a pint of whiskey a week. He is out of rehab, and living in Paquin Towers, trying to get his Social Security and Medicaid back, he says. He is really a poor

_____

[5]Hypogonadism is the condition in which the production of sex hormones and germ cells are inadequate. Gonads are the organs of sexual differentiation —- in the female, they are ovaries; in the male, the testes. Along with producing eggs and sperm, they produce sex hormones that generate all the differences between men and women. If they produce too little sex hormone, then either the growth of the sexual organs or their function is impaired.

Case 2:08-cv-04165-REL   Document 16   Filed 05/29/09   Page 15 of 26

historian.  It sounds like he has Medicaid for his medicines, so I am not quite sure what he is trying to do, but it sounds like mostly he is trying to get an SSI check back."  Plaintiff denied any chest pains or shortness of breath.  His heart had a regular rate and rhythm, normal S1 and S2 sounds, no S3 or S4, no rubs or murmurs.  He was assessed with alcoholic cardiomyopathy, stable; alcoholism, ongoing; erectile dysfunction; and hypogonadism. "Encouraged completed cessation from alcohol." (Tr. at 213).

On February 6, 2007, plaintiff saw Dr. Quint for a follow up on alcoholic cardiomyopathy and hypogonadism (Tr. at 215).  "He continues to complain of erectile dysfunction.  He continues to drink alcohol. . . .  He is mainly asking for Viagra." Plaintiff's blood work was all essentially normal.  He was assessed with erectile dysfunction, alcoholism (ongoing) and alcoholic cardiomyopathy (stable).

On February 16, 2007, plaintiff saw a urologist for a prostate biopsy (Tr. at 219-221).  The records reflect that plaintiff was smoking a half a pack of cigarettes per day, although not "regularly."  The results were normal.

On March 6, 2007, plaintiff returned to see Dr. Quint (Tr. at 216).  Plaintiff continued to admit to a half pint of alcohol a week.  "He continues to ask for more Viagra, but when I asked him whether the Viagra helped, he said he has not actually even

Case 2:08-cv-04165-REL   Document 16   Filed 05/29/09   Page 16 of 26

used it to try intercourse, and yet he is asking for more Viagra." Plaintiff's exam was normal. He was assessed with alcoholic cardiomyopathy (stable), alcoholism (ongoing), and erectile dysfunction with questionable hypogonadism.

On June 6, 2007, plaintiff saw Dr. Quint for a follow up, and said he had no problems or complaints (Tr. at 210). The notes reflect that plaintiff was able to carry groceries, and there was a reference to one pint of whiskey per week.

On June 7, 2007, Dr. Quint completed a Medical Source Statement - Physical (Tr. at 205-207). He found that plaintiff could lift 25 pounds frequently or occasionally, walk four hours per day and for one hour at a time, sit for eight hours per day and for eight hours at a time, and had an unlimited ability to push or pull. He found that plaintiff could occasionally climb, balance, stoop, kneel, crouch, or bend. He found that plaintiff had no restriction on his ability to reach, handle, finger, feel, see, hear, or speak, and he had no environmental limitations. Dr. Quint did consider plaintiff's subjective complaints. He found that rest would be helpful to plaintiff, but that he did not need to recline, lie down, or prop his legs up during the day.

**B.   *SUMMARY OF TESTIMONY***

During the July 17, 2007, hearing, plaintiff testified as follows.  Plaintiff was 54 during the hearing and is currently 56 years of age (Tr. at 281).  He is single and was living at a facility for handicapped and disabled people (Tr. at 281).  He moved into that facility in November 2006 (Tr. at 281).  Prior to that he was homeless and stayed in a New Life Evangelistic Center (Tr. at 282).

Plaintiff finished his sophomore year in college and is trained to be a cosmetologist (Tr. at 282).  He is 5' 10" tall and weighs 185 pounds (Tr. at 282).

Plaintiff has not worked since he was found disabled in 2001 (Tr. at 283).  Plaintiff owned a hair salon from 1986 through about 1991 (Tr. at 284).  He worked as a cosmetologist and had a moving company during the 1990's (Tr. at 284).

Plaintiff is able to stand for about an hour at a time, and he can sit comfortable "indefinitely" (Tr. at 285, 289).  Plaintiff takes "a little nap" twice during the day (Tr. at 285-286).  Each nap is about an hour long (Tr. at 286).

Plaintiff can no longer work as a cosmetologist because he cannot stand all day long (Tr. at 286).  He walks one-half to one mile at a time for exercise (Tr. at 287).  He believes he could lift about 25 pounds (Tr. at 289).  Plaintiff can bend over

18

"some," he can squat "some," he has no problems going up and down stairs (Tr. at 289-290). Plaintiff cleans his own apartment and does his own cooking and shopping, all without difficulty (Tr. at 290). He takes the bus when he goes shopping (Tr. at 291). He cannot drive due to his DWI convictions (Tr. at 291).

An average day includes playing bingo, singing or playing tambourines with a band, and watching television (Tr. at 288-289). Plaintiff is an usher at his church and attends two services on Sundays (Tr. at 292).

Plaintiff had an alcohol problem, but he completed the Phoenix program in October 2006 (Tr. at 286-287). He attends Alcoholic Anonymous meetings once a month (Tr. at 287). When asked whether he had been able to stop drinking entirely, plaintiff said, "Every once in a while I take a drink." (Tr. at 287).

## V. FINDINGS OF THE ALJ

Administrative Law Judge F. Terrell Eckert, Jr., entered his opinion on August 28, 2007. He found that plaintiff has not engaged in substantial gainful activity at any time since May 15, 2006 (Tr. at 14); that he suffers from alcoholic cardiomyopathy, stable; and alcoholism, in early remission (Tr. at 17); and that he has not established the existence of any impairment or combination of impairments which significantly limits his ability

19

to perform basic work-related activities in the absence of
significant alcohol use (Tr. at 18).  Therefore, the ALJ found
that plaintiff does not suffer from a severe impairment as
defined in the Act (Tr. at 18).

The ALJ concluded that plaintiff "has experienced medical
improvement of his impairments and, since May 15, 2006, no longer
has a 'severe' impairment as that term is defined in the Act.
Accordingly, the claimant's benefits were properly ceased on May
15, 2006." (Tr. at 19).

## VI.  SEVERE IMPAIRMENT

Plaintiff argues that the ALJ erred in finding that he does
not suffer from a severe impairment.

A severe impairment is an impairment or combination of
impairments which significantly limits a claimant's physical or
mental ability to perform basic work activities without regard to
age, education, or work experience.  20 C.F.R. §§ 404.1520(c),
404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-
severe impairment.

(a)  Non-severe impairment(s).  An impairment or
combination of impairments is not severe if it does not
significantly limit your physical or mental ability to do
basic work activities.

(b)  Basic work activities. When we talk about basic
work activities, we mean the abilities and aptitudes
necessary to do most jobs.  Examples of these include--

20

   (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

   (2) Capacities for seeing, hearing, and speaking;

   (3) Understanding, carrying out, and remembering simple instructions;

   (4) Use of judgment;

   (5) Responding appropriately to supervision, co-workers and usual work situations; and

   (6) Dealing with changes in a routine work setting.

Plaintiff argues that only medical evidence can be used to make this determination, and that the limitation on standing and lifting placed on plaintiff by his doctor establishes that he suffers from a severe impairment.

Plaintiff is correct that medical evidence is used to make this determination. It is only the plaintiff's age, education, and work experience which are not considered.

> This second step, referred to as the "nonsevere impairment test" or severity step, requires a determination of the existence of a severe impairment on the basis of medical evidence alone. Neither the appellant's age, education or work experience is considered in making this determination.

Anderson v. Heckler, 805 F.2d 801, 805 (8th Cir. 1986).

However, a minor restriction or symptom is not enough to overcome the plaintiff's burden at this step of the sequential evaluation.

> Section 423(d)(2)(A) . . . was enacted as part of the Social
> Security Amendments of 1967, 81 Stat. 868. It states that
> "an individual . . . shall be determined to be under a
> disability only if his physical or mental impairment or
> impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of
> substantial gainful work." Ibid. The words of this provision
> limit the Secretary's authority to grant disability
> benefits, not to deny them. Section 423(d)(2)(A) restricts
> eligibility for disability benefits to claimants whose
> medically severe impairments prevent them from doing their
> previous work and also prevent them from doing any other
> substantial gainful work in the national economy. If a
> claimant is unable to show that he has a medically severe
> impairment, he is not eligible for disability benefits. In
> such a case, there is no reason for the Secretary to
> consider the claimant's age, education, and work experience.

Bowen v. Yuckert, 482 U.S. 137, 147-148 (1987)

In this case, the evidence in the record establishes that
plaintiff's ability to perform basic work activities was not
limited by any impairment.

On May 16, 2006, the day his disability ceased, plaintiff
saw Dr. Greenberg and denied any symptoms at all.  His cardiac
check up was normal.  On May 23, 2006, Dr. Vale found no
exertional limitations, no postural limitations, no manipulative
limitations, no visual limitations, no communicative limitations,
and no environmental limitations.  She noted that plaintiff
denied chest pain and had a normal exam except for elevated blood
pressure which was most likely caused by ongoing excessive
alcohol use.  His activities of daily living, his ability to walk
one mile, and his lack of medical treatment supported her opinion

22

that plaintiff had experienced significant improvement in his medical status.

On July 7, 2006, plaintiff went to the emergency room. This was shortly after he learned that his benefits had been terminated. He walked to the hospital and felt fine by the time he arrived. His blood work was normal, his cardiac exam was normal, his chest x-rays were normal, and a stress echo showed a normal ejection fraction. A low ejection fraction was the basis for plaintiff's award of benefits in 2001. Plaintiff had stopped taking his medications and continued to drink heavily. His chest pain was determined to be caused by medication withdrawal.

On July 17, 2006, plaintiff entered the Phoenix program. He reported that he had experienced a medical problem one time during the past 30 days and had been bothered by it "not at all."

On August 14, 2006, he saw Dr. Quint only because his counselor at Phoenix told him he had to. He said he felt fine and had no complaints. He had no chest pain, no shortness of breath, no leg swelling. His cardiac exam was normal. Dr. Quint assessed alcoholic cardiomyopathy, stable.

On September 13, 2006, Dr. Altomari found no severe mental impairment.

On September 24, 2006, Ms. Brandon, a nurse in Dr. Quint's office, examined plaintiff who had a normal cardiac exam.

23

Plaintiff denied any problems with chest pain, shortness of breath, or leg swelling. He had run out of his medications despite having just seen Dr. Quint about five weeks earlier.

On October 16, 2006, he told Dr. Quint he felt "pretty well" and had no complaints. He was assessed with alcoholic cardiomyopathy, stable. He saw Dr. Quint again three months later on January 22, 2007. His only complaint was erectile dysfunction. He denied any chest pains or shortness of breath. His cardiac exam was normal. He was assessed with alcoholic cardiomyopathy, stable.

On February 6, 2007, plaintiff saw Dr. Quint, again complaining of erectile dysfunction. His blood work was all normal. He was "mainly asking for Viagra." He was assessed with alcoholic cardiomyopathy (stable) and ongoing alcoholism. On March 6, 2007, plaintiff saw Dr. Quint. His exam was normal. He was assessed with alcoholic cardiomyopathy (stable), and ongoing alcoholism.

Three months later, on June 6, 2007, plaintiff saw Dr. Quint for a follow up. He had no problems or complaints, was able to carry groceries, and continued to drink regularly. The following day Dr. Quint completed a Medical Source Statement limiting plaintiff to lifting 25 pounds and walking four hours per day. He listed no other limitations.

24

There simply is nothing in plaintiff's medical records to support a finding of a severe impairment. He continually told his doctors that he had no medical complaints. Plaintiff's medical records establish basically two problems: He continued to drink alcohol, and he continued to experience symptoms of erectile dysfunction. His cardiac exams were normal, his ejection fraction was normal, and he has experienced no symptoms related to his original disabling impairment.

The medical records are corroborated by plaintiff's administrative records in which he reported that his chest felt better when he stopped drinking (Tr. at 149), he was only bothered by bending and standing (Tr. at 161), and he was unable to explain how his medical condition prevented him from working (Tr. at 163).

## VII. CONCLUSIONS

Based on all of the above, I find that the ALJ properly found that plaintiff experienced significant medical improvement and is no longer disabled because he does not suffer from a severe impairment. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

25

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
May 29, 2009